Case 5:13-cv-01357-IPJ   Document 32   Filed 10/01/14   Page 1 of 16
Case: 14-14954   Date Filed: 10/31/2014   Page: 1 of 16

FILED
2014 Oct-01 PM 02:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

LARRY HALE STEPHENS, et al.,

    Plaintiffs,

vs.                                        CASE NO. CV-13-J-1357-NE

TEVA PHARMACEUTICALS, U.S.A.,
INC., et al.,

    Defendants.

## ORDER

Pending before the court is defendants Teva Pharmaceuticals USA, Inc., and Barr Laboratories, Inc.'s ("Teva" and "Barr") motion to dismiss and memorandum in support of said motion (doc. 18) and plaintiffs' response to said motion (doc. 22). After the defendants' motion and plaintiffs' response were filed, defendant Wyeth-Ayerst Laboratories, Inc., filed an unopposed motion to stay (doc. 21), based on a certified question pending before the Alabama Supreme Court arising out of *Wyeth, Inc., et al. v. Danny Weeks and Vicki Weeks* (No. 1101397) (Certified Question from the U.S. Dist, Ct., Mid. Dist. Al. , So. Div.: Case No. l:10-CV-602)).  This court therefore stayed this action, rendering the motion to dismiss moot.

Based on the Alabama Supreme Court now having ruled in the *Wyeth v. Weeks* action, this court held a status conference on September 22, 2014, in which the parties requested that the previously filed motion to dismiss (doc. 18), be reinstated. The court therefore **ORDERS** the same be and hereby is **REINSTATED.**

The parties further informed the court that neither defendants nor plaintiffs wished to amend their previous filings based on the Alabama Supreme Court's answer to the certified question raised in *Wyeth v. Weeks, supra*. With this background, the court turns to the pending motion and the plaintiffs' response.

For the reasons set forth in this court's Order of October 31, 2013 (doc. 15), the court dismissed the plaintiff's Amended Complaint and allowed the plaintiff to file a Second Amended Complaint (SAC) (doc. 16). The plaintiffs claim that

> Wyeth's Cordarone was approved as a drug of last resort for patients suffering from documented recurrent life-threatening ventricular fibrillation and ventricular tachycardia when these conditions would not respond to other available anti-arrhythmic drugs and therapies. Wyeth also aggressively and successfully marketed Cordarone for "off-label" uses as a "firstline anti-arrhythmic therapy."
>
> Defendant Wyeth's fraudulent and misleading marketing campaigns resulted in warning letters from the FDA to stop the false and misleading promotion of the drug that downplayed the risks and promoted the drug as a first line anti-arrhythmic therapy.

SAC, ¶¶ 15-16.

The SAC alleges that the decedent, Larry Hale Stephens, was prescribed amiodarone, the generic formulation of Cordarone, in February 2010, due to atrial fibrillation.[1] SAC, ¶ 19. According to the SAC, Mr. Stephens took this medication as prescribed for ninety (90) days. SAC, ¶ 19. At the time this medication was prescribed,

---

[1] This prescription was filled by Hunstville Hospital pharmacy. *See e.g*, SAC, at 7, n. 11 and 12. The court gleans from the footnoted information that the decedent received the full 90 day supply in one prescription.

2

Mr. Stephens did not receive a Medication Guide, which warned of a variety of side effects from amiodarone. SAC, ¶¶ 21-22. The plaintiff alleges that decedent was not aware that his use of the medication was for an "off-label" use and, as noted above, he was not in a situation of last resort as to his atrial fibrillation. SAC, ¶ 19.

Approximately two and a half years after completing the prescribed course of medication, in "the fall of 2012," Mr. Stephens began to experience a variety of the symptoms listed in the Medication Guide as potential side effects. SAC, ¶ 27. Also according to the SAC, Mr. Stephens learned in April of 2013 that his symptoms and pulmonary disease were the result of taking amiodarone. SAC, ¶ 29. As a result of his symptoms and pulmonary disease, Mr. Stephens died on July 19, 2013, at the age of 61. SAC, ¶ 30.

Based on these facts, the SAC asserts causes of action for negligence (Count I), claiming defendant Wyeth failed to adequately test Cordarone, and failed to adequately warn users and physicians as to the dangers of Cordarone; violation of the Alabama Extended Manufacturers' Liability Doctrine (AEMLD) (Count II), by defendants Teva and Barr, for placing the generic drug amiodarone into the stream of commerce in a defective and unreasonably dangerous condition; breach of the implied warranties (Count III) as to defendants Teva and Barr, because amiodarone was not reasonably fit for the off-label purpose for which it was prescribed to Mr. Stephens; fraud (Count IV) against all defendants, in that they knew or should have known of the dangers to patients who

used both Cordarone and the generic formulation marketed as amiodarone; wrongful death[2] (Count V) against all defendants; and loss of consortium (Count VI), brought on behalf of Mrs. Stephens only.

Accepting the allegations of the SAC as true, and construing them in the light most favorable to the plaintiffs, *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 2200 (2007), the court turns to the defendants' motion to dismiss. When evaluating a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). It requires "more than a sheer possibility that a defendant has acted unlawfully." *Id*.

## A. Can the Complaint Survive Iqbal and Towmbly?

The plaintiffs allege that decedent's doctor prescribed amiodarone; that in February 2010, decedent took a 90 day course of amiodarone; that in December 2012

---

[2]This action is styled as "Larry Hale Stephens and Margaret Stephens, individually and as Administrator of the Estate of Larry Hale Stephens." Larry Hale Stephens, individually, cannot bring an action against defendants for the wrongful death of Larry Hale Stephens. Rather, that action belongs to his estate, which is also a named plaintiff. To the extent the plaintiffs attempt to state a wrongful death action by any plaintiff other than Mrs. Stephens as Administrator of decedent's estate, the same is due to be and hereby is **DISMISSED**.

4

decedent was hospitalized for pulmonary disease; that in April 2013, decedent learned his pulomonary disease was related to amiodarone; and that in July 2013, decedent died. The SAC does not enlighten the court as to the source of Mr. Stephens' April 2013 knowledge. The mere fact that someone believes something to be true does not create a plausible inference that it is true. *See Twombly*, 550 U.S. at 551 (finding a complaint insufficient even though it said, "Plaintiffs allege upon information and belief that [defendants] have entered into a contract, combination or conspiracy to prevent competitive entry...."). Under *Iqbal*, "conclusory statements" or "naked assertions devoid of further factual enhancement" do not insulate a complaint from a motion to dismiss. *Iqbal*, 556 U.S. at 678 (citations omitted).

The SAC wholly fails to draw any connection between decedent's ailments and defendants' actions, other than an allegation concerning what decedent learned from an unnamed source concerning medical problems which began several months prior and which he alleged were caused by a medication taken two and a half years earlier. At a minimum, plaintiffs would need to allege some concrete basis for their assertion that Mr. Stephens death was caused by amiodarone. The allegation that "the medicine stays in your body for months after treatment is stopped" does not bridge this gap. SAC, ¶ 24.

Plaintiffs continue that

> The allegation is not one of adequacy or "content" failure to warn (i.e., the verbiage fails), but actual and physical failure of the Teva and Barr Defendants to fulfill their federally mandated responsibility to ensure Medications Guides are available for distribution to patients. *See* 21 C.F.R

5

>   208. Larry Stephens did not receive the federally mandated Medication Guide. (SAC ¶ 21).

Plaintiff's response (doc. 22-1), at 8.

The plaintiffs fail to assert how the lack of a Medication Guide[3] has any bearing on a claim of failure to warn for medication prescribed for an off-label use. The above quoted language suggests that the plaintiffs concede the "content" of the relevant warnings were sufficient, and they seek to recover solely for the failure of decedent to receive the Medication Guide.

Additionally, plaintiffs' argument leaves open the possibility that defendants met their obligations to furnish the Medication Guide, but the distributor of the medication, specifically Huntsville Hospital pharmacy, failed to provide that same information to decedent. In other words, taking the allegations of the complaint as true, the court cannot conclude that the pleadings, under *Twombly* and *Iqbal,* establish "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678, citing *Twombly*, 550 U.S. at 556. Without a well-founded allegation that Hunstville Hospital Pharmacy failed to provide a Medication Guide to plaintiff because defendants did not supply the Guide to the pharmacy along with the medication, as required by 21 C.F.R. § 208.24, this claim cannot survive.

---

[3] The failure to provide a Medication Guide is discussed in depth in section B, *infra*.

6

### B. *Even if the SAC survives Iqbal and Twombly, what is left after Mensing and Bartlett?*

Defendants Teva and Barr raise identical grounds as previously before the court in this action, namely that the United States Supreme Court cases *PLIVA Inc. v. Mensing*, 564 U.S. —, 131 S.Ct. 2567, 2572, reh'g denied, 132 S.Ct. 55 (2011) and *Mutual Pharm Co. v. Bartlett,* – U.S. –, 133 S.Ct. 2466, 2470 (2013), preempt all of the plaintiffs' claims against these two defendants.

The two Supreme Court cases, *supra*, clearly establish that a manufacturer of a generic drug cannot be held liable for the content contained in warnings about those medications, as the Food and Drug Administration (FDA) mandates that generic manufacturers use warnings identical to those approved by the FDA for the name brand medication. *See e.g., Bartlett,* 133 S.Ct. at 2470. See also *Frazier v. Mylan, Inc.*, 911 F.Supp.2d 1285 (N.D.Ga.2012). The plaintiffs respond that *Mensing* and *Bartlett* do not apply in this action because plaintiffs do not seek to recover for any alleged inadequacy of the label on the generic medication, but rather assert that "Teva and Barr Defendants engaged in 'off label' promotion." Plaintiffs' response (doc. 22-1), at 8. However, such assertion is belied by the actual claims in the complaint, which against these two defendants are violation of the Alabama Extended Manufacturers' Liability Doctrine (AEMLD) (Count II), by defendants Teva and Barr, for placing the generic drug amiodarone into the stream of commerce in a defective and unreasonably dangerous condition; breach of the implied warranties (Count III) as to defendants Teva and Barr,

because amiodarone was not reasonably fit for the off-label purpose for which it was prescribed to Mr. Stephens; fraud (Count IV) against all defendants, in that they knew or should have known of the dangers to patients who used both Cordarone and the generic formulation marketed as amiodarone; wrongful death (Count V) against all defendants; and loss of consortium (Count VI), brought on behalf of Mrs. Stephens only.

The AEMLD claim and failure to warn claim are wholly preempted by federal law.  In *Bartlett*, the Supreme Court held that state "design defect" claims that turn on the adequacy of a drug's warnings are preempted by federal law. *Id*., 133 S.Ct. at 2472. Under both *Mensing* and *Bartlett*, plaintiffs cannot sue a generic manufacturer on a failure to warn claim or a state law design defect claim that turns on the adequacy of a drug's warnings.

Plaintiffs wholly fail to distinguish their AEMLD claim from that before the court in *Bartlett*.  For example, the SAC asserts that "the ... amiodarone manufactured, distributed, and/or supplied by Defendants was defective due to inadequate post-marketing warning and instruction because, after Defendants knew or should have known of the risk of injury from ... amiodarone, especially in "off-label" use, Defendants failed to provide adequate and required warnings to physicians, users or consumers ..." SAC, ¶ 73.  The court finds this states a classic "failure to warn" claim,  despite plaintiffs' representations otherwise in their response to the motion to dismiss.[4]  As

---

[4]Such allegations further underscore the plaintiffs' use of conclusory allegations.  While plaintiffs' assert that amiodarone was defective and that defendants failed to provide adequate and

8

discussed by the court in its Order of October 31, 2013, defendants Teva and Barr are prohibited from posting any warnings different from those of Wyeth's, as approved by the FDA. Order of October 31, 2013 (doc. 15), at 12.

Plaintiffs again turn for support to the Eastern District of Louisiana case *Whitener v. PLIVA, Inc.*, 2012 WL 3948797 (E.D.La.2012). As this court previously noted, in *Whitener,* the Hon. Eldon Fallon concluded that a claim against a generic drug manufacturer was allowed to proceed on the theory that the defendant actively promoted an off-label use of the medication. However, that court also ruled that plaintiffs must "plead sufficient factual content regarding what marketing or promotional representations were made, by which Defendants, to whom, and how those statements violated applicable federal law." *Id.*, 2012 WL 3948797, * 1. As noted in section A of this opinion, the plaintiffs' pleadings fall far short of such a standard, assuming the same is even proper to apply.

The court again finds that *Whitener* fails to help the plaintiffs in any way. Plaintiffs assert that Mr. Stephens was not provided with the Medication Guide, and further that Mr. Stephens was prescribed amiodarone for a purpose not within the label. Given these pleadings, the court is struck by the inherent contradiction in plaintiffs' allegations, specifically that they were not provided warnings for a use of amiodarone

---

required warnings, the plaintiffs provide no support for such statements at all. All the court can surmise from such pleadings is that whatever the warnings were, the plaintiffs claim they were insufficient. No specific reasons, or medical articles, or specific studies, are referenced.

9

that was not within those warnings. The plaintiffs both rely on the lack of being provided a Medication Guide to claim failure to warn, and further argue that those very warnings were insufficient to warn of adverse side effects when the medication was used for an off-label purpose.

Taking the allegations of the complaint as true, plaintiff Larry Hale Stephens was prescribed amiodarone by his treating physician for an off-label purpose. The off-label purpose, atrial anti-arrhythmic therapy, was not new or novel, but rather had been promoted by defendant Wyeth for numerous years. Plaintiffs' allegations concerning the labeling of amiodarone all predate decedent's use of the medication by more than five years, and are mainly irrelevant to any claim of Mr. Stephens. For example, the FDA contacting defendant Wyeth in 2003 regarding the use of Cordarone by children and pregnant women (SAC, ¶ 54) does not bear any relevancy to whether decedent's doctor was misled by any of the defendants concerning any literature or usage of amiodarone when he prescribed it for decedent in February 2010.

Despite the various manners in which plaintiffs couch their allegations, in essence the plaintiffs sue for the decedent's doctor's decision to prescribe a dangerous medication for an off-label use. The plaintiffs' allegations fail to reach a level which shifts the responsibility for this decision from Larry Stephens' treating physician to any of the defendants.

Unlike the facts before the court in *Wyeth, Inc., v. Weeks*, 2014 WL 4055813

(Ala.2014), the plaintiffs here do not allege that the defendants "falsely and deceptively misrepresented or knowingly suppressed facts about [the medication] such that [the treating] physician, when he prescribed the drug [], was materially misinformed and misled about the likelihood that the drug would cause dyskinensia and related movement disorders." *Id.*, at * 2.  Plaintiffs allege only that defendants failed to warn them, not Mr. Stephens' doctor.[5] Plaintiffs fail to allege that defendants misrepresented anything to Mr. Stephens' doctor.  Put simply, the plaintiffs fail to allege that but for defendants' misrepresentations or suppressions about amiodarone, Larry Stephens' doctor would not have prescribed this medication.  Similarly, while plaintiffs allege "Larry was not aware that his use of the medication was for an 'off-label' use," the relevant inquiry is whether his physician was aware of this.

Plaintiffs arguments concerning the lack of a Medication Guide provided to him does not salvage his claims.  The plaintiff has not alleged that defendants failed to comply with the requirements of the relevant Code of Federal Regulations sections. Those regulations require that Medication Guides be provided by a manufacturer to the

---

[5] Plaintiffs generally allege that defendants concealed adverse event information while the "simultaneously engaged in a massive and fraudulent marketing and promotional scheme..." SAC, ¶ 74.  Plaintiffs fail to assert when this massive and fraudulent marketing and promotional scheme occurred.  Because amiodarone has been available in its name brand formulation since the mid-1980s, and as a generic since 1998, the plaintiffs need more than this loose allegation to establish that Mr. Stephen's doctor would not have prescribed amiodarone for him in February 2010 had defendants not promoted the medication for the relevant off-label use while concealing its harmful side-effects.

11

distributor of a medication, not the end user. *See* 21 C.F.R. § 208.24(b).[6] While the patient is intended to be the ultimate recipient of the information contained in the Medication Guide, the court has no allegation before it that Larry Stephens' failure to

---

[6]The relevant Code of Federal Regulations section states in relevant part as follows:

§ 208.24 Distributing and dispensing a Medication Guide.

(a) The manufacturer of a drug product for which a Medication Guide is required under this part shall obtain FDA approval of the Medication Guide before the Medication Guide may be distributed.

(b) Each manufacturer who ships a container of drug product for which a Medication Guide is required under this part is responsible for ensuring that Medication Guides are available for distribution to patients by either:

>   (1) Providing Medication Guides in sufficient numbers to distributors, packers, or authorized dispensers to permit the authorized dispenser to provide a Medication Guide to each patient receiving a prescription for the drug product; or

>   (2) Providing the means to produce Medication Guides in sufficient numbers to distributors, packers, or authorized dispensers to permit the authorized dispenser to provide a Medication Guide to each patient receiving a prescription for the drug product.

(c) Each distributor or packer that receives Medication Guides, or the means to produce Medication Guides, from a manufacturer under paragraph (b) of this section shall provide those Medication Guides, or the means to produce Medication Guides, to each authorized dispenser to whom it ships a container of drug product.

(d) The label of each container or package, where the container label is too small, of drug product for which a Medication Guide is required under this part shall instruct the authorized dispenser to provide a Medication Guide to each patient to whom the drug product is dispensed, and shall state how the Medication Guide is provided. These statements shall appear on the label in a prominent and conspicuous manner.

(e) Each authorized dispenser of a prescription drug product for which a Medication Guide is required under this part shall, when the product is dispensed to a patient (or to a patient's agent), provide a Medication Guide directly to each patient (or to the patient's agent) unless an exemption applies under § 208.26.

21 C.F.R. § 208.24.

receive the same in 2010 was due to a breach of regulations by the defendants, as opposed to a mid-level distributor, or the Hunstville Hospital Pharmacy.

In Count II, the plaintiffs allege that amiodarone was unreasonably dangerous and given its inherent dangerousness, did not contain adequate warnings. The plaintiffs continue that had amiodarone contained adequate warnings, Mr. Stephens would not have taken the drug. SAC, ¶ 105. This is again a failure to warn claim, despite plaintiff's attempts to make it otherwise. *See e.g, Wyeth v. Weeks*, 2014 WL 4055813, * 4 (Ala.2014) (holding fraudulent misrepresentation concerning the dangers of a medication is not a claim that the drug ingested was defective, but rather a claim that defendant suppressed information about the manner it was to be taken, removing it from the realm of products-liability actions). Plaintiffs do not assert that amiodarone should have never come to the marketplace because of inherent dangerousness, or that there was a reasonable, safer alternative to the medication. Rather, plaintiffs assert that defendants failed to warn Mr. Stephens that amiodarone was a medication of last resort for ventricular fibrillation and that his doctor's prescribing the same for atrial fibrillation was an "off label" use.

The Sixth Circuit, having examined each Circuit's application of *Mensing* as of December 2013, summarized as follows:

> These circuits have interpreted *Mensing* to broadly preempt claims that are, at their core, claims that the generic manufacturer failed to provide additional warnings beyond that which was required by federal law of the brand-name manufacturers. *See Schrock v. Wyeth, Inc.*, 727 F.3d 1273,

13

>   1287-90 (10th Cir.2013) (holding that federal law preempts breach-of-warranty claims premised on a theory that generic manufacturers provided improper descriptions or warnings); *Guarino v. Wyeth, LLC*, 719 F.3d 1245, 1247–49 (11th Cir.2013) (holding that the plaintiff's state-law claims against the generic manufacturer for not "adequately warn[ing] medical providers of the risks associated with long-term use of metoclopramide" were all claims "premised upon an allegedly inadequate warning" and therefore preempted under *Mensing)*; *Bell v. Pfizer, Inc.*, 716 F.3d 1087, 1095–96 (8th Cir.2013) (rejecting the plaintiff's argument that *Mensing's* preemption analysis "applies only to allegations that a generic manufacturer should have unilaterally changed the content of its metoclopramide label," finding this to be an "unduly narrow view of *Mensing*" and holding that the plaintiff's claims for negligence and misrepresentation under the Arkansas Product Liability Act were "preempted failure to warn claims" (emphasis omitted)); *Morris v. PLIVA, Inc.*, 713 F.3d 774, 777 (5th Cir.2013) (per curiam) (holding that "*Mensing* forecloses such [failure-to-communicate] claims because failure to 'communicate' extends beyond just a label change" and includes "affirmative steps to alert consumers, doctors, or pharmacists of changes in the drug label," actions that the generic manufacturer is prohibited from taking unilaterally under federal law); see also *Gaeta v. Perrigo Pharm. Co.,* 469 Fed.Appx. 556 (9th Cir.2012), *aff'd* 562 F.Supp.2d 1091 (N.D.Cal.2008) (granting summary judgment in favor of the generic manufacturer of over-the-counter ibuprofen because the plaintiff's state-law claims for negligence, breach of express warranty, and breach of implied warranty based on an inadequate warning were preempted).

*Strayhorn v. Wyeth Pharmaceuticals, Inc.,* 737 F.3d 378, 391-392 (6th Cir.2013).

### C. Even if Twombly, Iqbal, Mensing and Barlett were not dispositive, the Learned Intermediary Doctrine defeats Plaintiffs' Claims

Alabama courts follow the learned-intermediary doctrine, and thus, a "manufacturer's duty to warn" a consumer about a drug "is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use." *Stone v. Smith, Kline & French Labs*., 447 So.2d 1301, 1304 (Ala.1984) (quoting

*Reyes v. Wyeth Labs.*, 498 F.2d 1264, 1274 (5th Cir.1974)). *See also Batchelor v. Pfizer, Inc.*, 2013 WL 3873242, *2 (M.D.Ala.2013) ("Defendant had no duty to warn Plaintiff, only to warn her physicians adequately and honestly, and Plaintiff offers no factual allegations to support the theory that there was an inadequate or dishonest warning."). Additionally, the plaintiffs "must show that the manufacturer failed to warn the physician of a risk not otherwise known to the physician and that the failure to warn was the actual and proximate cause of the patient's injury." *Stone*, 447 So.2d at 1304. Hence, the plaintiff must show not only that an inadequate warning was given, but also that an adequate warning would have prevented the injury. *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1313 (11th Cir.2000); *Ellis v. C.R. Bard, Inc.*, 311 F.3d 1272, 1279 (11th Cir.2002) ("the learned intermediary doctrine is nearly universal; where drugs or medical devices are only available to the public by prescription from a physician or dentist, the products manufacturer fulfills its duty to warn by advising the professional of the dangers of the product ...") (citations omitted); *Christopher v. Cutter Labs.*, 53 F.3d 1184, 1192 (11th Cir.1995) (same); *In re Trasylol Products Liability Litigation*, 2011 WL 2117257, *3 (2011) (plaintiff failed to meet burden of showing under Alabama's learned intermediary doctrine that, if an adequate warning was provided, the prescribing physician would have acted differently and plaintiff's injuries would have been avoided). Clearly, the decision to use a medication as a first-line treatment is uniquely up to the prescribing medical professional and based on a decision concerning his or her

15

individual patient.

Considering the foregoing, the court finds that the plaintiffs' failure to allege Mr. Stephen's prescribing physician was not adequately informed about the risks of amiodarone as a treatment for atrial fibrillation is fatal to plaintiffs' claims.

### D. Wrongful Death and Loss of Consortium

Without surviving allegations of wrongdoing on the part of defendants Barr and Teva, no factual basis for these claims remains.

In light of the foregoing, the court is of the opinion that defendants Barr and Teva's motion to dismiss (doc. 18) is due to be granted.

It is therefore **ORDERED** by the court that said motion be and hereby is **GRANTED**. The claims against these defendants are **DISMISSED**. Although the plaintiffs filed their response to the motion to dismiss with an alternative request for relief to further amend their Second Amended Complaint, the court is of the opinion that any such amendment would be futile. The alternative motion to amend is therefore **DENIED**.

**DONE** and **ORDERED** this the 1st day of October, 2014.

INGE PRYTZ JOHNSON
SENIOR U.S. DISTRICT JUDGE